In the Matter of the Will of JOSEPH F. JOHNSON, Deceased.

*(Surrogate's Court, County of New York, Filed February, 1894.)*

1. WILL—EXECUTION.

A will may be proved by the evidence other than the testimony of the subscribing witnesses.

2. Same—Competency.

A mind partially clouded by drink may execute a valid will.

3. Same.

The fact that the testator had an epileptic fit does not raise a presumption of disability after he has recovered from the attack.

4. Same—Undue influence.

The act of a party addicted to intemperance, in disposing of his property, will not be invalidated on the ground of undue influence exercised over him by the inmates of his family, through kind offices springing from attachment or affection.

Application for the probate of a will.

Henry Kropf, for executor; Christion G. Moritz (Henry Hoyt, of counsel), for Eliza J. Johnson; Fernando Solinger and Charles H. Beckett, for contestants.

Fitzgerald, S.—Objections were filed by the father of decedent to the admission to probate of the paper propounded as his will. The first question that arises affects the validity of its execution. The subscribing witnesses, Hollings and Kelly, prove compliance with all the formalities required by the statute except that Hollings does not recollect a declaration by the testator that the paper was his will, or a request for him to sign it as a witness. He admits, however, that he was requested to sign by the proponent, Mr. Drake, who superintended the execution of the paper. It is evident that Hollings did not regard the event as of sufficient importance to charge his memory with all the details connected with the execution. He did not recall the fact that on the same occasion he had signed another will—that of the testator's sister—and his memory was at fault in respect to the time of the execution. His recollection was that it took place between nine and ten o'clock in the morning, whereas, it was not until late in the afternoon. Kelly's testimony is sought to be discredited, because inconsistent with statements in a certain affidavit that he made long after he had signed the will as a subscribing witness, and also because of contradictions in the testimony he gave upon collateral matters.

To provide against the infirmities of memory and the possible hostility of subscribing witnesses, the law, by a long line of decisions, has established that the execution of a will may be proved by other evidence. This principle is recognized in section 2620 of the Code of Civil Procedure. In the Matter of Cottrell (95 N. Y. 329), both subscribing witnesses testified, not only that the formalities requisite for the due execution of a will were not complied with, but they denied that either was present at the time of the execution of the will, or signed the attestation clause. Yet the court held, on proof of the circumstances surrounding the preparation of the instrument, the genuineness of the testator's signature, and the recitals in an attestation clause in his own handwriting, that the surrogate has sufficient facts to justify him in finding a valid execution. In the case at bar, there is not only a full attestation clause, but the testimony of the witness Drake, a reputable man, engaged in an extensive real estate business in this city, who, though not an attorney, has had experience in the drawing of wills and legal papers pertaining to real estate transactions, leaves no doubt that all the acts necessary for the valid execution of a will were performed, even without the confirmatory testimony of Miss Battjer and Freibly, who were present when the will was executed. I could not hold the contrary except on the assumption that the will was the result of a conspiracy, to support which five witnesses had been guilty of perjury.

The execution of the will having been established, the issues as to testatomentary capacity and undue influence will be considered.

Joseph F. Johnson was still a young man at his death. He had been addicted to the excessive use of intoxicating liquors for many years; had come to be a drunkard, and had suffered from delirium tremens, and some months after the execution of the will he was an inmate of the Inebriate Home. His mental powers were probably never robust, and had been weakened by his excesses.

Drunkenness may so becloud the mind as to make it incapable

of doing an intelligent act. But the disability ends when the exciting cause is removed. In this it differs from insanity, which, once shown to exist, is presumed to continue until there is proof that intelligence and reason have asserted themselves. A drunkard may execute a valid instrument within a day, or even less, from a time when it would be conceded that he was incapable. In each case the question to be determined is, whether at the time he was sober, or if not, whether his mind was so affected by drink that he was not sufficient master of himself to give expression to his real wishes. One may be so indifferent to his interests that he will neglect his estate, or, if not indifferent, his habits of intemperance may disable him from caring for it, and even make it necessary for a committee to be appointed that his estate be not wasted. It does not follow that he does not know that he has an estate which he can bestow, of what it consists, or that he has not a preference as to who shall receive it after his death. A clear mind is needed to conduct a complicated business transaction. A mind partially clouded by drink may execute a valid will. The proofs are positive that on the 23rd day of October, 1891, when the will in question was prepared and executed, Johnson was sober. Making due allowances for the defective memory of witnesses and their possible disposition, by reason of interest or prejudice, to vary their narratives from strict truth, the weight of evidence is that he had then been sober for some days, if not weeks. He was ill on that day and also on the day previous. If Johnson's mind was so weakened that he could not conserve his estate, yet, if he could recollect its nature and extent, and those for whom, following the usual impulses of men, he would provide, he had the capacity to make a valid testament. It is not questioned that on October 23, 1891, he knew that there were two houses on Avenue C, and certain property at Sugarloaf, that had come from his mother's family, and that it was within his power, as incident to his ownership thereof, to give it to his father, to his sister, or both, or to a stranger.

It is not necessary to refer to the many cases in this State in

which the wills have been sustained, and which are far more sug-
gestive of testamentary incapacity by reason of drunkenness of
the testators than the one under consideration.

I will only cite the leading case of Peck v. Carey, 27 N. Y. 9,
and the recent decision in the Matter of William A. Reed, 2
Connolly, 403.

The fact that Johnson had an epileptic fit does not raise a pre-
sumption of disability after he had recovered from the attack.
Contestants claim that it occurred on the morning of the day the
will was signed.   If so, I am satisfied from the evidence that
it did not affect his capacity in the afternoon.   The opinion
expressed by Dr. Lines, who was called as an expert, but who
never had seen Johnson, and that of Hollings, the subscribing
witness, that the testator was incompetent to make a will, are
outweighed by others, who proved acts and words that showed
his capacity.

Nor is the allegation of undue influence sustained by the
proof.   On the morning of the day on which he signed the
paper Johnson sent for Mr. Drake, not once, but twice, and, after
his arrival in response to the second call, he stated to Mr. Drake
his wishes in respect to the disposition of the property, and
asked that a deed should be prepared by which his estate should
go to his sister.   After discussion he acquieced in the suggestion
that a will be also prepared.   Late in the afternoon Mr. Drake
returned with the papers.   Both were read to Johnson, who
stated them to be in accordance with his wishes.   On the same
occasion a reciprocal will and a reciprocal deed were executed
by his sister to him.

Certain previous declarations are shown to have been made by
Johnson that his estate was to go to his father.   If he had exe-
cuted a will containing that provision, it was his right, even
capriciously, to revoke it.   But his declarations never took the
form of a will or other legal paper.   They probably expressed
his feelings at the time they were made, but had no further sig-
nificance.   There is abundant proof of other declarations by
him showing indifference, if not hostile feelings, for his father.

He stated that his father had committed a criminal assault on his sister in her childhood.    Such an act would have furnished a reasonable motive for the father's disinheritance, as would the belief of the testator in the statement he had made, and this irrespective of its falsity, provided that such belief was not an irrational one or the result of an insane delusion.   No evidence has been presented controverting the statement, or showing that it was the product of unreason or of such a delusion.

On the question of undue influence exercised on a drunkard in the procurement of a will, the rule laid down in Gardner v. Gardner, 22 Wend. 526, is still the law.  It was held there that "the act of a party addicted to intemperance, in disposing of his property, will not be invalidated on the ground of undue influence exercised over him by the inmates of his family, where the influence arises from kind offices springing from attachment or affection, and that to vitiate the act the influence must be shown to have arisen from threats, force or coercion destroying free agency, and the boon to have been obtained by such coercion or by importunity that could not be resisted producing compliance for the sake of peace."    In Williams' Will, 19 N. Y. Supp. 778, 46 St. Rep. 791, the General Term in the third department held that the fact that the will disinherited kindred was not alone evidence of undue influence, nor the fact that the memorandum for the will was prepared by the person who was to be largely benefited thereunder, and who was active in procuring its execution.    Nor was the fact that the will was not in accordance with the testator's previously expressed intentions, although it may have an important bearing in connection with other facts; but, without such facts of a pertinent and forcible character, a change in purpose in making a testamentary disposition would not invalidate the will.

Much of the testimony adduced on both sides on the trial refers to matters more or less remote from the day of the execution of the will, and was of such a character as to justify the suspicion that the question of Johnson's mental soundness on that day was not free from doubt, but it did disprove the statements of other

witnesses showing that at the time of the execution of the will testator was of sound and disposing mind. The conveyances and reconveyances and the mortgaging of the property, the acceptance by Johnson of eight dollars a week—less than half the income of his share of the property—and afterwards a pittance of thirty cents a day out of the income when Mrs. Reilly had, under such anomalous circumstances, become possessed of the legal title to the real estate, the continuance without protest for years after he had attained majority of a guardianship begun when he was a child, and other facts proven, show a weakness of mind, but are not inconsistent with testamentary capacity. They suggest a suspicion of undue influence. They do not prove its exercise and under all the circumstances of the case I do not believe it was exercised. A few hours after the testator signed the paper he spoke with satisfaction of the disposition he had made of his estate. Subsequently he expressed the same satisfaction. Later he asked if the will had been recorded, supposing that such an act was proper and necessary to give it effect. He lived for more than a year after its execution, during which time no expression of a desire to change it is shown. I am satisfied that the paper expressed the deliberately formed wishes of a capable testator.

It may be admitted to probate.