(15 Misc. Rep. 439.)

MOSHEIM et al. v. SCHWARTZ.

(City Court of New York, General Term. January 28, 1896.)

APPEAL—NOTICE—VIEW OF FACTS.
Where the notice of appeal in a case tried by jury is from the judgment only, the general term of the city court of New York has no power to review facts.

Appeal from trial term.

Argued before FITZSIMONS, McCARTHY, and BOTTY, JJ.

(15 Misc. Rep. 308.)

In re HALBERT'S WILL.

(Surrogate's Court, Oneida County. December, 1895.)

1. WILLS—CAPACITY TO MAKE—USE OF INTOXICANTS.
Testatrix made her will in her sixty-eighth year. It was shown that she was irritable and eccentric, and addicted to the excessive use of intoxicants; that, although scrupulous as to her appearance and deportment in her younger days, she had become careless, vulgar, and immodest; that she was sober at times, and, when sober, rational, and capable of transacting business; and that she was sober when she executed her will. *Held,* that she was not shown to have become incompetent to make a will by the use of intoxicating liquor.

**2. SAME—RELIGIOUS BELIEF—DELUSIONS.**
  Testamentary capacity is not affected by the fact that testatrix believed in Spiritualism, in the absence of delusion as a result thereof.

**3. SAME—UNDUE INFLUENCE.**
  Undue influence is not sufficiently shown by evidence that the will was made in favor of one in testatrix's employ, on promptings of friendship and gratitude.

Proceeding by contestants to revoke the decree admitting to probate the last will and testament of Martha B. Halbert, deceased. Decree confirmed.

L. E. Goodier, for contestants.

H. S. Patten (William Kernan, of counsel), for proponent.

CALDER, S. This proceeding is to revoke the decree entered in the surrogate's office of Oneida county on the 3d day of December, 1894, admitting to probate, after a prolonged contest, the last will and testament of Martha B. Halbert, deceased. Surrogate Bright, before whom the evidence was taken, died before rendering his decision, and by stipulation of all parties the case was submitted to Surrogate Bentley, who upheld the validity of said instrument. On the 10th day of December, 1894, a petition was filed by the contestants asking that said decree of probate be revoked, alleging, as a basis for such relief, that said instrument was not the last will and testament of Martha B. Halbert; that said Martha B. Halbert was not, at the time of making, subscribing, or declaring said instrument, of sound mind and memory; that said witness did not sign said will at the request of decedent; that the execution of said instrument was obtained by fraud and undue influence; and that it was not sufficiently proved before the surrogate's court when admitted to probate. The taking of evidence in respect to the matters set forth in said petition was begun before the present surrogate on the 14th day of February, 1895. Many hearings were had, and considerable time was necessarily consumed by respective counsel in the preparation and trial of said case. The record is voluminous, comprising nearly 1,800 pages of printed matter. Decedent's first husband was John F. Batchelor, who died in 1878, and in 1880 she married Horace Halbert, who died in 1887. Testatrix was born October 9, 1821, and died June 22, 1892. The will was dated and executed May 10, 1889. At the time of the execution of the instrument in question she was, therefore, in her sixty-eighth year. For convenience, the petitioners in this proceeding, who were the contestants in the former one, may be designated as contestants and the answering party as proponent.

Beyond contradiction, the decedent had been for many years a slave to the use of intoxicants. She was always irritable and eccentric. In her younger days she was particular in her personal appearance, and proper in conversation. As the years advanced there was a noticeable change, until, in the latter part of her life, she manifested little interest in the care of her home, and was often vulgar in talk and immodest in her acts. Many witnesses

were called by contestants, who described acts and repeated conversations tending to establish irrationality on her part, but almost invariably there was associated with this evidence a statement that she was either drunk or had been drinking. Standing apart from the temporary effect of intoxicants, her acts and conversations would indicate mental aberration, or, perhaps, symptoms of a diseased mind.

No precise rule can be laid down by which testamentary capacity can be measured. In the execution of deeds, mortgages, contracts, and instruments of like character, there are at least two parties whose minds and energies are antagonistic. A will, when voluntarily executed, is the act of one person, uninfluenced and uncombated by any other agency, and therefore the decisions are that less mental capacity is required to execute a will than any other legal instrument. Eccentricities, religious beliefs, peculiarities, and even impairment of the mind, do not render one incompetent to execute a will. The expression "sound mind" does not mean, in the execution of a will, that one must possess a perfect intelligence. It is the degree of intelligence that determines and controls. It is easy to distinguish between a sound mind and the condition of a maniac, but there is some difficulty in determining testamentary capacity where there is the presence of a manifest change in one's mind, amounting to aberration or impairment, attributable, perhaps, to thoughts on certain subjects, or fancies, or occasioned by grief, illness, and causes of a similar nature. A monomaniac may have capacity to make a will, the theory being that, as to one subject, he is insane; as to all others, sane. In re Forman's Will, 54 Barb. 274. That an aged person is forgetful, and, at times, labors under slight delusions, does not, per se, establish testamentary incapacity. Society v. Loveridge, 70 N. Y. 389. There is no presumption of incapacity by reason of the advanced age of testator. Horn v. Pullman, 72 N. Y. 269.

It must be conceded that the constant use of intoxicating drink will impair the mind, and may ultimately render one incapable to execute an instrument testamentary in character. But the most pronounced drunkards have times when they are sober, and have perfectly lucid intervals, and every act performed at such times is legal and binding. Their deranged condition of mind is transitory, and is not unlike that arising from certain kinds of illness. Drunkenness may cloud the intellect for the time, but reason returns when the exciting cause has disappeared. Peck v. Cary, 27 N. Y. 9, a case often cited, was where the will of a confirmed drunkard was established, though executed after a protracted debauch, and he had drunk several times during the day of its execution. In Van Wyck v. Brasher, 81 N. Y. 260, it was held that an habitual drunkard was not incompetent to execute a deed. To render him incompetent, there must be proof that, at the time of the execution, he was in a state of actual intoxication. In Re Johnson's Will, 7 Misc. Rep. 220, 27 N. Y. Supp. 649, it appeared that testator had been addicted to the use of intoxicating liquors for many years, had suffered delirium tremens, was an inmate of an inebriate asy-

lum, and, shortly before the execution of his will, had fallen into an epileptic fit; yet it was held he had testamentary capacity, and his will was admitted to probate. In Re Reed's Will (Surr.) 20 N. Y. Supp. 91, the testator had been adjudged by a jury an habitual drunkard. He had been committed to a state asylum for the insane, where he remained about 11 months, then released on probation, but was recommitted, then released, and his drinking habit continued. It was held that these facts failed to establish mental incompetency, and the will was admitted to probate.

The rule drawn from many decisions of our courts is that, if one can comprehend the act he performs, knows the persons who are the subjects of his bounty, understands the nature and extent of his property, is able to retain these matters in his mind during the execution, and the testamentary act is free from delusions, he is competent to make a legal will.

More than 30 witnesses testified to numerous things said and done by decedent when sober, and gave detailed statements of many business transactions in which she was engaged, and in which she took an active and rational part. The witnesses for contestants, most of whom were frank in statements and honest in convictions, have failed to establish that the testatrix, when free from the immediate influence of strong drink, was insane, or there was such an impairment of the mind as would render her incompetent to execute the will in question. Their principal witness, Mrs. Humphrey, testified that, a number of times, she was with decedent when they talked about the current news of the day, social matters, newspaper topics, and discussed different subjects; that she rode with her summer and winter, and, when at the house of decedent, she showed her relics, consisting of jewelry, china, and pictures that she had brought from England. These visits continued to shortly before her death. The decedent was evidently sober during these times.

On March 6, 1889, about two months before the execution of this will, an action was tried in the supreme court before a referee, decedent being the plaintiff, wherein she sought to recover damages for an alleged trespass, and asked for an injunction restraining defendant from using a certain driveway. The referee was called by proponent, and testified to what took place before him, and detailed evidence which was given by decedent. She was examined by respective counsel, and no suggestion was offered by any one, at that time, as far as the evidence discloses, that she was mentally unable to engage in litigation, or to take part in the transaction which was the subject of said litigation.

It is incumbent upon the contestants to prove, nct only that decedent had been intoxicated, or was usually intoxicated, but that she was so in fact at the very time the will was executed, or that her mind was so clouded by drink that she was incompetent to give expression to her real testamentary intentions. Peck v. Cary, 27 N. Y. 9; Van Wyck v. Brasher, 81 N. Y. 260; In re Johnson's Will, 7 Misc. Rep. 220, 27 N. Y. Supp. 649; In re Reed's Will (Surr.) 20 N. Y. Supp. 91; Andress v. Weller, 3 N. J. Eq. 608; Lee's Case, 46 N. J. Eq. 193,

18 Atl. 525.    Upon this proposition we have the testimony of five persons who saw the decedent the day the will was executed, and of Dr. Ford, who saw her more than 24 hours after its execution.    He had not seen her since the preceding March.    His evidence upon the question of her actual intoxication between the hours of 9 and 10 on the evening of May 10th cannot have much weight in determining this question.    Mrs. Humphrey, for contestants, testified that she took the 1 o'clock car for Whitesboro, stopped in West Utica for about an hour, arriving at Mrs. Halbert's shortly after Dr. Ford had left, and, according to her testimony, decedent must have been in a drunken stupor, although able to converse with the witness.    In the former trial, from her evidence, she was at Mrs. Halbert's either at the time or before Dr. Ford was there; that she had told this occurrence numberless times, and yet, upon this trial, her testimony was materially changed in reference to the time of her arrival at decedent's house.    It must be held, from her entire evidence, that, if she was there, it was at the time testified to by her in the former trial. Her recollection as to material things must have been better at that time than it was after an elapse of nearly three years.    Her interest in behalf of contestants was undisguised.    Dr. Ford, as far as the evidence discloses, was the last person who saw the decedent until the evening of that day.    He testifies that he knew the decedent for many years, noticed her increasing drunkenness, and the deterioration which goes with constant drink.    He saw her in her own house in a state of intoxication, and met her on the streets when she was in the same condition, and the deterioration of her mind manifested itself in her appearance, manner of dress, and talk, and especially in her housekeeping.    He was at the house of decedent between half-past. 2 and 3 o'clock in the afternoon of May 10th.    She was garrulous, but did not manifest in any other way that she had been drinking, and was able to walk up and down stairs.    In his judgment, she was incompetent to make a will that day, although, if sober, she might have been competent; but, as a matter of fact, he did not remember much about how he found her, which statement he also made in the former trial.    From his entire evidence, there is nothing on which to base the proposition that she was insane, or, when sober, that her mind was so impaired that she was not master of her faculties as far as a testamentary act was concerned.    In answer to the question put by the court, "Did you find anything the matter with her except alcoholism on the first day?" he answered, "That is about all.    I think there was a slight cold."    His observation was made many hours before her will was executed.    It is not an unusual occurrence that one addicted to the use of strong drink may be somewhat under its influence, and in seven hours after be able to transact ordinary business.    This evidence, in its entirety, fails to establish that decedent was drunk on the evening of May 10th, especially when contradicted by direct and positive testimony.

Rebutting the idea of her being intoxicated is testimony of three witnesses for proponent, who were present when the will was executed. In the morning of May 10th Mr. Patten, the attorney who drew the will, was at the house of decedent, and there made a memorandum from

which, during the day, he drew this will; and, according to his testimony, she was perfectly sober that morning, and during the evening, between 9 and 10 o'clock, when the will was executed, there was no indication of her being drunk; and, while there, she did not drink. Messrs. Jones and Miller, the subscribing witnesses, were there for about an hour, and detailed conversations had with decedent, described quite minutely what took place preceding and at the execution of the will, all the statutory requirements being complied with, and gave convincing testimony that she was sober, did not drink when they were present, and that the act performed by her was free and voluntary. As far as the evidence discloses they have no pecuniary interest in sustaining this will, and their evidence must be given great weight in determining this controversy. If decedent was drunk when this will was executed, then three reputable witnesses, in order to render valid this instrument, which is apparently signed by a steady hand, have committed willful perjury. This evidence does not warrant such a conclusion. It must be held that, at the time of this execution, she was not under the influence of intoxicating liquor and was able to dispose of her property by a testamentary instrument.

Another ground urged by contestants is that this will should be set aside by reason of undue influence exerted upon decedent by Thomas Kirk, who was her coachman, and who is made her residuary legatee. It appears he had been in her employ for a few years, and was, no doubt, anxious and interested as to the manner in which decedent would dispose of her estate. She apparently preferred his company to that of any other person. They had been seen together when drunk, and on different occasions he was abusive and disrespectful. He advised, on several occasions, as to collecting money, paying bills, and making certain purchases. She declared that she would do well by him, and that the Batchelors and some of her kindred would not receive any of her money. Influence, in order to vitiate a testamentary act, must be undue. It is not undue if it is a reasonable argument, suggestion, advice, persuasion, or urging one's personal claims upon the bounty of another. Undue influence has been described as that "which overpowers the will without convincing the judgment." It must be an influence which is exerted by fraud and coercion, and not that which arises through affection, gratitude, or feelings of like character. Many wills have been sustained where one's own family have been disinherited. From the evidence there is nothing to show that Kirk talked with Patten as to the preparation of this will, and he was not present at its execution. If Mrs. Halbert did not wish to have him enjoy her property, she could easily have executed another will. Applying the principles of our well-settled decisions, the evidence fails to establish that this instrument was obtained by fraud, or that undue influence was exerted over the mind of the testatrix. In re Snelling, 136 N. Y. 515, 32 N. E. 1006; Brick v. Brick, 66 N. Y. 144; Cudney v. Cudney, 68 N. Y. 148; Marx v. McGlynn, 88 N. Y. 357.

Some evidence was given in reference to the religious belief of decedent. For many years she had been a Spiritualist, and had done many things consistent with the teachings of Spiritualism. She

visited the cemetery, and communed with the spirits of her deceased husbands; set.apart a bedroom for them, in order that they might have a place to rest when they visited her; placed at the table a sufficient number of plates for them; and did numerous other things, attributable, from this evidence, to her belief.     We are not to treat Spiritualism theologically, but legally, in its application to the testamentary capacity of the testatrix.     It matters not what our individual opinion may be as to facts, formalities, or claims of Spiritualism.     That has nothing to do with this case.     There is no evidence that decedent did things other than those which are understood to be the result of the teachings of Spiritualism.     There was no delusion, which was the result of her belief, which entered into the execution or preparation of this instrument.     It is well settled that believers in this faith, when testamentary capacity is in question, must be considered in the same light as those who take part in any other religious ceremony.     In re Keller's Will (Sup.) 3 N. Y. Supp. 629; In re Vanderbilt's Will, 3 Redf. Sur. 384; In re Will of Vedder, 14 N. Y. St. Rep. 470.

The foregoing conclusions lead to the conviction that the decree heretofore entered admitting said last will and testament to probate was proper, and should therefore be confirmed.

Decreed accordingly.