On probate of a will made in 1889, and codicils made in 1890 and 1892, it appeared that the testator, subject to hereditary insanity, was committed to an asylum in 1882 for alcoholic insanity, and at the end of three months discharged, but not as cured, and again committed in 1893. The expert who examined him in his last commitment testified that he was then, and had been for several years, suffering from chronic alcoholic insanity. Physicians who attended him in 1886 and 1888 testified that he was then suffering from the disease, and was of unsound mind. The will, without any explanation, gave one of his two sons a larger share than the other, and of the property devised to his wife part was her own and part property which had been sold by testator several years before. The actual provision for his wife, who had watched over him faithfully, was about one-half the amount devised to a sister and her children. One of the attesting witnesses to the will, who had known the testator intimately, testified that he was insane when he made his will, and the evidence of the two others was doubtful. Evidence of the witnesses attesting the codicils as to the mental capacity of the testator was clearly insufficient to authorize their probate. There was evidence of many irrational acts committed by him after 1882. While several persons who had met him casually testified that his acts were rational, and letters and documents showing acts entirely rational were given in evidence, his familiar acquaintances testified that he was of unsound mind. *Held*, that mental incapacity, due to a general condition of insanity, was shown, which made the will void.

Application for probate of the will of John R. Ely, deceased. Probate was contested by Phebe M. Ely, widow, and the People's Trust Company, committee of George C. Ely, a lunatic son. Probate denied.

Ernest H. Jackson, George G. Reynolds, Henry C. M. Ingraham, and George S. Ingraham, for proponents.

Charles H. Otis and Wingate, Cullen & Miller, for contestants.

John B. Lord, special guardian.

ABBOTT, S.  John R. Ely died on the 1st day of September, 1895. He left, him surviving, his widow, Phebe M. Ely, and two sons, Henry D. Ely and George C. Ely. Three papers, purporting to be his last will and testament and two codicils, have been propounded for probate. ·The will bears date April 17, 1889; the first codicil, December 29, 1890; the second codicil, May 17, 1892. Objections to the probate of these instruments were filed by the widow and by the People's Trust Company, as committee of the estate of George C. Ely, a lunatic, specifying the usual grounds. The objections filed by the widow also allege undue influence, but no evidence was offered tending to prove this allegation. I will first review the general features of the life of the testator in their chronological order, and the development of his habits both of mind and body.

In his youth and early manhood his habits were exemplary; his temperament joyous, and even boisterous. He was not addicted to the use of intoxicating stimulants, nor was the tone of his conversation either profane or vulgar. At this early period, some of his

acts, as detailed by the witnesses of the proponent, were at least eccentric in their excess of roughness. In the year 1854, when he was about 25 years old, his habits had undergone a complete change. He had then commenced the excessive use of alcoholic stimulants, was frequently intoxicated, and his language was at times profane and vulgar. He was twice married. His first wife bore him two children, Henry D. Ely and George C. Ely, who survived him. His second wife also bore him two children, one of whom lived to be 10 years and 6 months old, and died about 1882. The other died in infancy. His habits of intemperance increased as time advanced, until in the years from 1878 to 1882 scarcely a day passed in which he was not grossly intoxicated. In March, 1882, his condition was such that it became necessary to send him to an institution for the insane, the Long Island Home, at Amityville, Long Island, and at about the same time a committee of his estate was appointed, after due proceedings, by order of the county court of Suffolk county. While an inmate of the Long Island Home, he was extremely violent, and was placed under restraint. At this time he was unquestionably insane. This is conceded by counsel for the proponent, and testified to by their witnesses. The suggestion was made by counsel for proponent, in summing up, that Ely was, at this time, suffering from delirium tremens. I have been unable to find any testimony in support of this suggestion. On the contrary, the evidence all tends to prove that he was suffering from alcoholic insanity, to which he was rendered peculiarly susceptible by reason of an hereditary tendency to insanity. He remained an inmate of the Long Island Home for about three months, and was then taken to his home at Bayport by his wife, although not discharged as cured. He was especially liable to insanity as a result of his grossly excessive use of alcoholic stimulants, by reason of a tendency in that direction, inherited from his mother. It is not disputed that his mother was insane for many years; that his brother now is, and has been since 1884, an inmate of an institution for the insane; that his sister has been an inmate of such an institution; and that his son, George C. Ely, is now insane, and under the control of a committee of his person and estate; and that John R. Ely himself was judicially declared to be insane in the years 1882 and 1893. The evidence, therefore, is practically undisputed that in the year 1882 John R. Ely was suffering from alcoholic insanity. From this time on to the time of the appointment of his second committee, in September, 1893, he continued his excessive use of liquor, so that for periods of weeks at a time he drank and shouted throughout entire days and nights. Perhaps the strongest testimony as to the extraordinary quantities of whisky which he drank is that of one of the proponents' witnesses. The statement upon this subject made by the witness Elijah Lee St. John would seem almost incredible, except that it is supported in a general way by the testimony of nearly all of the witnesses on both sides. On February 7, 1885, he made an attack upon Miss Catharine E. Lott, his wife's sister,—struck her on the head with a pitcher, and knocked her down, when his wife and George C. Ely came to her rescue. On Christmas day, 1885, he had a stroke of paralysis. He had another

stroke in the summer or early fall of 1888.  In February, 1886, he
was attended professionally by Dr. Clinton A. Belden, of Jamaica,
Long Island, who testified: "Q. On the occasion of your first call
on February 11, 1886, what was the matter with Mr. Ely?  What
did you attend him for?  A. I called to see him for insanity.  He
was insane.  Q. Occasioned by what?  A. The excessive use of
whisky."  At this time Mr. Ely declared his intention to Dr. Belden
of floating a farm and buildings from Connecticut to Long Island,
so as to have it handy.  Dr. Belden testifies that in 1886 Ely was of
unsound mind, and incapable of the management of his affairs.  He
was attended professionally by Dr. Samuel Hendrickson, of Jamaica,
Long Island, from August 2, 1888, to October 8, 1888.  Dr. Hendrick-
son testifies that he attended Ely for chronic alcoholism; that he
was of unsound mind, and incapable of transacting business.  From
June, 1893, down to the time of his decease, Dr. Essig attended him.
Dr. Essig testifies that Mr. Ely was insane when he commenced his
professional treatment in June, 1893, and was at that time suffering
from chronic paralytic insanity.  Dr. Carlos F. MacDonald was
called by the contestants, both as an expert upon mental diseases
and as to the facts of a personal examination which he made of Mr.
Ely in October, 1893.  He testifies that at the time of his examina-
tion of Mr. Ely his conclusion was that Mr. Ely was suffering from
chronic insanity, complicated with paralysis, and that such insanity
was of long standing.  Aided by the facts assumed in the hypo-
thetical question, Dr. MacDonald states unqualifiedly that Mr. Ely
was, and for several years had been, suffering from chronic alcoholic
insanity, which became subsequently complicated with paralysis;
that in Mr. Ely's case a double cause for his insanity existed, the
predisposing cause being an hereditary tendency, and the exciting
cause the excessive use of alcohol; that, if alcoholic insanity ever
exists, and the excessive use of alcoholic stimulants be thereafter
continued, this would tend to aggravate the condition, and to pro-
gress it downward; that chronic alcoholic insanity is not usually
regarded as a recoverable form of disease, and that he did not know
and had never read of a case of recovery where the excessive use of
alcohol had been continued after the insane condition had been
established.  The proponents introduced no medical testimony what-
ever in rebuttal.

I shall not undertake to review at length the testimony of the lay
witnesses called in behalf of the contestants.  It certainly fully
bears out the testimony of the physicians who attended Mr. Ely,
and proves beyond question the existence of a variety of delusions
from the year 1879 down to the time of his death, in September,
1895, such as opening his distillery on Sunday, and complaining that
the workmen were not at their occupation; imagining that he heard
voices in the hall, there being no persons in the hall; that his son
George was dying in a barrel in the yard; that his brother-in-law
was dead, and that he saw him hanging upon a tree near the house;
facetiously biting off and eating the head of a mouse; imagining
that he was being pursued by the military and United States revenue
officers.  We find him constantly carrying on conversation with imag-

inary persons, particularly with his deceased son, whom he called "Dad"; using profane and indecent language at all hours of the night and day to a degree which is scarcely conceivable, and as well at times when no one else was in the room as when other persons were present, always in a loud tone of voice, except when he was too ill to make a noise; forcing his wife with threats and profanity to remove her clothing, in order that he might send it to his sister; repeatedly making attacks upon his wife, striking her, choking her, and once, in 1887, when she was ill in bed, threatened with pneumonia, seizing her by the hair, making use of the vilest and most disgusting epithets towards her; accusing her of infidelity; imagining that she had men concealed in the house; exposing his person in the presence of women; locking cats and dogs in his wife's sleeping room; screaming and shaking his fists in the air; attacking his man-servant, and threatening to take his life; breaking parts in the doors of his house; concealing, on one occasion, a carving knife on his person, and, on another, a hatchet in his bed; going to the office of the hotel where he boarded clad only in his night shirt; giving away large sums of money to servants; striking an old friend in the neck, who had called upon him at his request; striking a stuffed eagle in the parlor of a friend's house; sparring at his own reflection in the mirror; imagining that particular individuals were passing the house, no persons being in sight; and manifesting other like delusions. No suggestion has been made of any reason for his animosity towards his wife, or that the slightest foundation existed for his accusations against her. On the contrary, the witnesses on both sides agree, and the evidence clearly proves, that her entire life with him, after about the year 1879, was one of constant and uncomplaining self-sacrifice and devotion to the care of her husband, and that he depended on her almost entirely in every relation of life. His letters to his wife, received at various times from 1881 to 1888, constitute the most remarkable specimens of incoherency, profanity, and vulgarity which have ever fallen under my notice. It were charity, indeed, to believe that a man capable of writing such letters was insane. On repeated occasions, even within a few months previous to his signing the will, he declared his intention never to make a will, because people who made wills died; that it would not be worth a damn if he did; and that his property should be divided into three piles. A large number of the lay witnesses called by the contestants had known Mr. Ely intimately for many years, and had seen him frequently; and none of these, with the exception of two or three, were in any way related to Mrs. Ely, nor had they any interest whatever in the contest. After detailing the conversations and actions of Mr. Ely, they were all of the opinion that such conversations and actions were irrational.

I will now take up the will itself. The first clause directs the payment of debts, funeral and testamentary expenses. The second clause provides as follows:

"Second. Having heretofore given to my wife, Phebe M. Ely, a certain farm and premises at Bayport, in the town of Islip, Long Island, and a farm known as the 'James Lott Farm,' at Jamaica, Long Island, I give to my said wife all

my right, title, and interest in and to the shore front and strand and all other lands adjoining said premises at Bayport aforesaid, and the water rights appurtenant thereto, and I give to my said wife all the farming utensils, horses, wagons, live stock of all kinds, furniture. and personal property of whatever character (except books and private papers), belonging to me, on either of said places at Bayport and Jamaica, aforesaid, at the time of my decease. I give to my said wife, also, two bonds of one thousand dollars each of the South Brooklyn Central Railroad Company, now in her possession, and ten shares of the capital stock of the Long Island Railroad Company, the certificate of which stands in her name."

As a matter of fact, Mr. Ely's farm at Bayport had already been sold and conveyed by him, together with all of the farming utensils appertaining thereto, in the spring of 1886, three years before the will was signed by him. The farm had never been given by him to Mrs. Ely. From the sale of the farming utensils in 1886 there had been reserved "some little things he took a fancy to. I think there was a little harrow,—he reserved that for his garden,—and I think a little plough." This was the extent of the farming utensils appertaining to the Bayport farm. Mrs. Ely had a house at Bayport, originally built upon an acre of ground given to her by Mr. Ely's brother Henry. Mrs. Ely then bought the adjoining acre, and may have received the money with which to pay for it from her husband. Some of the witnesses testified that it was the usual custom among the people at Bayport to refer to Mrs. Ely's property as "the little farm," as contradistinguished from "Mr. Ely's big farm"; but these witnesses almost invariably, in referring to Mrs. Ely's property in the course of their testimony, referred to it either as "Mrs. Ely's place" or "the little place." At all events, a two-acre place would hardly be designated in a solemn and formal instrument like a will as "a farm." As to the "James Lott Farm," so called, Mrs. Ely acquired it in part by inheritance from her father's estate, and in part by purchase from her co-devisees under her father's will. The bonds and stock referred to in the same clause of the will were already in the possession of Mrs. Ely, and were her property. The third clause contains the only real provision in the will for his wife. It gives to the Long Island Loan & Trust Company 230 shares of the capital stock of the New York Central & Hudson River Railroad Company, in trust to receive the dividends and income thereof, and pay the same to Mrs. Ely during her life, and upon her decease to pay them to his sons, Henry and George, one-half to each, during their respective lives, with remainder to their respective issue, or, in default of issue, to the survivor. The value of this stock in the year 1889 was shown to be $28,750. This gift for Mrs. Ely's benefit was in lieu of dower. Then follow, in the fourth and fifth clauses, general legacies to various persons, varying in amounts from $100 to $1,000 each, amounting in the aggregate to $3,000. By the sixth clause he gives to Elijah Lee St. John $5,000 in trust for St. John's children. Elijah Lee St. John was a first cousin of Mr. Ely.

"Seventh. I give to the Congregational Church of Simsbury, Connecticut, the sum of one thousand dollars, in trust to be invested, and so much of the income thereof as may be necessary to be applied to keep in order the burial plot in the burying ground adjacent to said church in which my parents and grandparents are interred; the residue of said income, if any, to be applied to the use of said church."

It is to be noted as a curious circumstance that Mr. Ely makes no provision for the care of the burial plot in which his own remains and those of his first wife are interred, nor for the care of that in which the remains of his two deceased children by his second wife are laid. By the ninth clause he gives to the Long Island Loan & Trust Company 600 shares of the capital stock of the Chicago, Rock Island & Pacific Railroad Company, in trust for the benefit of the children of his sister, Mrs. Adams, during their respective lives, remainder to their issue. The value of this stock in 1889 was about $54,000. By the tenth clause he gives to his son George C. Ely a savings bank account in Connecticut and 10 shares of the capital stock of the Long Island Railroad Company, standing in his name. By the eleventh clause he gives to the Long Island Loan & Trust Company 250 shares of the capital stock of the New York Central & Hudson River Railroad Company, in trust to pay the dividends to his son George during his life, remainder to his issue, if any, and, in default of issue, to Henry D. Ely, if living, or, if not living, to his issue. The twelfth clause disposes of the residuary estate. This is given to the Long Island Loan & Trust Company, in trust to invest and pay the income to Henry D. Ely until he becomes 38 years of age, with remainder over in the event of his decease before that time. Upon Henry's arriving at the age of 38 years to divide the residuary estate into two equal shares, and pay the income of one share to each of his sons, Henry and George, during their respective lives, with remainder over to their issue, if any, or to the survivor if no issue. The total personal estate of the testator amounts to about $300,000. Henry D. Ely was 32 years of age and George C. Ely was 29 years of age at the time of their father's decease.

The provisions of this will strike me as at least unusual and eccentric. The gift to his nephews, the children of Mrs. Adams, and their issue, amounts to at least three times as much as the benefits derived under the will by Mrs. Ely, his faithful and devoted wife. No reason appears in the testimony for the discrimination in favor of his son Henry as against George during an arbitrary period. It does not appear that George received any benefit from his father during his life, while it does appear that Henry did receive such benefits to the amount of about $20,000. Until Henry arrives at the age of 38, the benefits derived from Mr. Ely's bounty by the children of his sister, Mrs. Adams, amount to nearly twice as much as those which his son George would enjoy.

I will now review the facts attending the execution of this document, and the testimony of the subscribing and other witnesses to its execution. The witnesses to the will were Edward White, an insurance broker, and John G. Jenkins, president of the First National Bank of Brooklyn. The will was executed in triplicate.

Edward White testifies that he knew Mr. Ely for about eight or ten years, and effected his insurance for him. Saw him once or twice a year. Recognizes his signature to the will, and remembers the occasion of his witnessing it. States that Mr. Ely, Mr. Jenkins, Mr. Coombs, and Mrs. Ely were present. Did not see Mr. Ely sign the will. Mr. Ely simply wanted Mr. White to acknowledge his sig-

nature. Mr. Ely said it was his will, and Mr. Jenkins signed first, and then Mr. White signed. Mr. Ely asked witness if he would not witness his will. What the transaction was afterwards witness does not know. He was not there. He left. "Q. What do you say as to his mental condition, and the soundness of his mind, and his capacity to make a will, from what you observed there? A. I thought he was pretty sound that morning. I never found him in any other way. Q. You never did find him in any other way? A. No. Q. In your opinion he was of sound mind that morning when he made the will? A. I think he was. Q. He knew what he was about, in your opinion? A. Yes, sir." The witness heard no conversation that morning between Mr. Coombs and Mr. Ely.

The testimony of Mr. Coombs may be now conveniently considered. Mr. Coombs, an attorney at law, attended upon the execution of the will. He had never seen Mr. Ely prior to that occasion. He went in company with Mr. Jenkins to the Wall House, where Mr. Ely was boarding. He subsequently went for Mr. White, as he remembers, at the suggestion of Mr. Ely, to request him to become a witness to the will. He testifies that Mr. Ely was garrulous, profane, vulgar, and obscene; that Ely signed in the presence of the witnesses; and that he (Mr. Coombs) asked all the formal questions pertaining to the execution of the will. In this respect his recollection differs from that of the witness White, who does not recollect that Mr. Coombs said anything while he was present, but thinks that Mr. Ely did all the talking. Mr. Coombs also thinks that Mrs. Ely was present. (Upon this point both witnesses are clearly in error. The evidence that she was in Bayport at this time is most convincing.) Mr. Coombs testifies that in his opinion the acts and conversation of Mr. Ely were rational. It does not appear that the wills were read to the testator, and he was not asked if he had read them. They were in his possession when Mr. Coombs called.

John G. Jenkins, the other subscribing witness, testifies that he had no distinct recollection of the time or place of the execution of the will. He does remember, however, the fact of its execution, and of his signing as a witness. Mr. Jenkins had known Mr. Ely intimately from boyhood, and since 1886 had charge of his property and investments, in connection with Mrs. Ely. Since that time he had directed all of his business transactions and dictated his investments, with but two exceptions, both of which resulted unfortunately. Mr. Jenkins was in the habit of seeing Mr. Ely personally at this period about four times a year. He states with great positiveness that at that time Mr. Ely was, in his opinion, insane. He says: "During that month, I would not let him get behind me. Q. What do you mean by that? A. I don't think my life would be safe, unless I had my eyes on him, at any time for the last fifteen years."

This evidence of the subscribing witnesses is unsatisfactory, and leaves the question of Mr. Ely's testamentary capacity open to serious doubt. Mr. Jenkins, the only witness to the execution of this will who had any intimate acquaintance with Mr. Ely, expresses in the strongest possible terms his conviction that he was insane at that time. The acts and conversations testified to by Mr. Coombs,

and which he characterizes as rational, were at least eccentric, and such as would hardly be looked for on such an occasion.

The first codicil bears date December 29, 1890. By this codicil the testator revokes the appointment of Jeffrey O. Phelps as executor, directs that his executors be required to give bonds in the sum of $5,000 each, and directs that his will and codicil be probated in Simsbury, Conn. The proponents did not offer any evidence whatsoever in support of this codicil. The subscribing witnesses were John G. Jenkins and W. A. Field. Mr. Jenkins' opinion as to the mental condition of Mr. Ely at this time has already been sufficiently indicated. The contestants called the other subscribing witness, Mr. Field, in their own behalf. Mr. Field testifies that he is cashier of the First National Bank of Brooklyn. That upon the occasion of his witnessing this first codicil "his manner was peculiar. Did not like the manner in which he spoke of things in general. He talked in rather an erratic manner. His conversations were erratic. His manner was what you might call boisterous. He talked loud, and used a few profane words. He was speaking in a reminiscent sort of manner. Spoke of different people,—different things past." Mr. Field's opinion was that "Mr. Ely was not of sound mind. His manner of speech and talk, etc., were such as to make me think he was of unsound mind. He talked in a wild and erratic manner. He talked in a low tone; then in a very loud tone. Jerked his words out. Occasionally used profane words." The impression which the conversation, manner, and tones of voice made upon this witness was such that he "wished he had not come into the house." It thus appears that the first codicil certainly could not have been admitted to probate upon the testimony of the subscribing witnesses alone.

The second codicil is dated May 17, 1892. It revokes the appointment of Jeffrey O. Phelps as executor, and appoints John G. Jenkins as executor in his place. The subscribing witnesses to this codicil were Frank Jenkins and William S. Irish. The testimony of those witnesses is substantially the same, except as to the conclusions which they reached concerning the testator's sanity. The witness Frank Jenkins is a broker, and a son of John G. Jenkins. To summarize the testimony of the witnesses of the second codicil: Mr. Jenkins and Mr. Irish called at Mr. Ely's room at about 8:15 a. m., and remained about 15 minutes. Mr. Jenkins brought the codicil with him. It was not read to or by Mr. Ely, and he had no conversation whatever with either of the witnesses during their entire stay, except to answer affirmatively Mr. Jenkins' formal questions on the execution of the codicil. Mrs. Ely was absent from the room nearly all the time. In her absence Mr. Ely was walking up or down the room, apparently mad or angry, and was mumbling to himself and swearing. Neither of the witnesses had any personal acquaintance with Mr. Ely, and had never previously exchanged a word with him, but had seen him before. Mr. Jenkins had seen him twice; once 17 or 18 years previously, and once 2 or 3 years previously. On the latter occasion he perceived a very marked change in Mr. Ely, and at that time he was swearing in the office of his attorney in a voice so

loud that "you could hear him all over the building." When the witnesses went away from the house Mr. Jenkins took the codicil with him. Both witnesses were disinclined to express any opinion as to Mr. Ely's mental condition, but Mr. Irish finally says that he was of sound mind so far as he could see. "He answered the questions all right."

The proponents called and examined at great length several witnesses, including the parents of some of the beneficiaries named in the will; farm hands who had at various times been employed by Mr. Ely upon his Bayport farm before he sold it in 1886; one neighbor of Mr. Ely's at Bayport; the attorney for the purchaser of a valuable parcel of real property from Mr. Ely, purchased and conveyed in the spring of the year 1889; and some others. I shall not undertake to discuss the testimony of all these witnesses. They described various occasions upon which they had met Mr. Ely, and with more or less detail testified to what occurred on those occasions; and all characterized his actions and the conversations testified to by them as rational. The large majority of these witnesses had seen Mr. Ely very seldom subsequent to the year 1886. Everything to which they testified might well have occurred, and still have been perfectly consistent with an insane condition of Mr. Ely. I should, perhaps, touch upon the testimony of Mr. Maddox, the attorney for Frank Seaman in the purchase of the "Distillery Property," so called, from Mr. Ely. Mr. Maddox had occasion to call upon Mr. Ely only once in connection with that transaction. He took to him a contract of sale for his signature, prepared by Mr. Maddox in accordance with the terms of an option to purchase which his client, Mr. Seaman, had previously procured from Mr. Ely. Mr. Ely refused to sign it until he had submitted it to his attorney. "Q. Did you observe anything in the conversation or acts of Mr. Ely at that time which was unusual, or out of the way, for any business man? A. Nothing, save his boisterous conduct, possibly. Q. In what respect? A. Loud voice. It was difficult to get him to agree with me first." Mr. Maddox states his opinion that the acts and conversations upon this occasion were "certainly rational." He had previously seen Mr. Ely on occasions when he thought he was intoxicated, and on those occasions he thought that Ely behaved in anything but a rational manner. Subsequently, in 1893, Mr. Maddox was one of the commissioners appointed by the supreme court upon an inquiry as to the sanity of Mr. Ely, in which proceeding Mr. Ely was adjudged to be insane. On the other hand, Mr. Seaman, Mr. Maddox's client, who purchased the distillery property from Mr. Ely for $106,000, had frequent interviews with Mr. Ely during his stay at the Wall House from October, 1888, to April, 1889, and had known him intimately for many years, visited at his house often, had been in his employ in the distillery business, and had bought out his business some years before the real estate transaction. Mr. Seaman, after detailing many conversations and acts, including those relating to the real-estate transaction in 1889, characterizes them as irrational. He excuses his purchase of the real estate from an insane man by the fact that before he entered upon the negotiations he consulted

Mrs. Ely and Mr. D. P. Ely, an uncle of John R. Ely, as to his intention, and secured their approval; and, further, upon the ground that he was actually paying Mr. Ely more than the property was worth, according to D. P. Ely's idea of its value. I regard the testimony of this witness as of especial weight, in view of the circumstances under which it was given.

I cannot pass by without comment the documentary evidence offered by the proponents, consisting of letters, receipts, etc. It may well be that these letters and documents are entirely rational, or even that they exhibit a high degree of shrewdness and intelligence; and yet these facts are by no means inconsistent with a condition of general insanity of Mr. Ely. Insanity is a positive and affirmative disease, to which extremely intelligent persons are subject, and insane persons may possess a high degree of intelligence and rationality with reference to a great variety of subjects. I have no doubt that Mr. Ely thought that he had made a will, and that he had practically excluded his wife from any benefits thereunder, and that he had made a discrimination in favor of his son Henry against his son George, and that he had conferred benefits upon his nephews, the children of his sister, Mrs. Adams, very greatly exceeding the benefits which he bestowed upon his wife. I have equally little doubt that at the time he executed this fantastical will and codicils he was generally insane, and the victim of a variety of delusions. In fact, I am of the opinion that he should have been restrained and kept in an institution for the treatment of insane persons from 1882 down to the time of his death, as I believe that at that time and ever afterwards he was irresponsible, and suffering from alcoholic dementia.

The rules of law applicable to the conclusion which I have reached upon the facts are well settled. They are, however, frequently confused with other principles which are applicable to an entirely different state of facts, and on account of this confusion I shall briefly express my view of the law by which the facts of this case must be controlled. The statute provides: "All persons, except idiots, persons of unsound mind, and infants, may devise their real estate," etc. 2 Rev. St. p. 56, § 1, as amended by Laws 1867, c. 782, § 3; 3 Birdseye's St. 3342. "Every male person of the age of eighteen years or upwards, and every female of the age of sixteen years or upwards, of sound mind and memory, and no others, may give and bequeath his or her personal estate by will in writing. 2 Rev. St. p. 60, § 21, as amended by Laws 1867, c. 782, § 4; 3 Birdseye's St. 3342. The construction which has been given to those or entirely similar provisions by the English courts has been adopted by the courts of this state. It is unquestionably now the settled law of both England and the state of New York that a monomaniac may make a valid will, provided his monomania has not had, and is not capable of having, any influence upon his testamentary dispositions. This conclusion was reached by the courts of England after many years of discussion, and after several decisions had been rendered, of which some held such wills to be valid, and others held them to be invalid. 1 Jarm. Wills (5th Ed.) p. 78, § 38; Browne, Insan. p. 252 et seq.,

§ 149, and cases cited and commented upon; Society v. Hopper, 33 N. Y. 619, 640. But it has never been held that a generally insane person, a lunatic, having a variety of delusions, or even a single delusion, which may have some effect upon his testamentary disposition, can make a valid disposition of his property while his mind is so diseased. In a case where general insanity is shown to exist as an habitual condition of mind, the proofs must be extremely clear that at the time the will was made there was an absence of the disease itself, and not merely of its apparent delusions. 1 Jarm. Wills (5th Ed.) p. 78, § 38; Browne, Insan., supra. The principle here stated has been frequently recognized in the decisions of the courts of this state. In the leading cases of Delafield v. Parish, 25 N. Y. 9, Davies, J., at page 22 et seq., reviews the earlier decisions of the courts of England and of this state upon the question of the degree of mental capacity requisite for the making of a valid will. The cases considered related almost exclusively to the testamentary capacity of weak, impaired, and imbecile minds, as distinguished from the minds of idiots and the affirmatively diseased minds of generally insane persons. Throughout this discussion Judge Davies assumes that generally insane persons, persons who are the victims of delusions, do not possess testamentary capacity. It would certainly seem that such persons would fall within the definition of a "person of unsound mind," without the necessity of much discussion or argument. Although Judge Gould dissented from the prevailing opinion upon the question of the testamentary capacity of the testator in that case, nevertheless he concurred entirely with the reasoning of Judge Davies upon the question now under consideration, and expressed his views at some length at page 70 et seq. A majority of the court concurred with the reasoning of Judge Gould upon this subject in the following memorandum at page 97:

"In law, the only standard as to mental capacity in all who are not idiots or lunatics is found in the fact whether the testator was compos mentis or non compos mentis, as those terms are used in their fixed legal meaning."

An exception is always made of idiots and lunatics. It is assumed that such persons are incompetent. This principle is recognized and reiterated in Society v. Hopper, 33 N. Y. 619. At page 624, Denio, J., says:

"Setting aside cases of dementia, or loss of mind and intellect, the true test of insanity is mental delusions. If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act, and speak like a sensible man. Dew v. Clark, 3 Addams, Ecc. 79."

Again, at page 630:

"In referring to the evidence on the part of the contestants, I have omitted a great deal which is related by them showing the folly, fatuity, and incoherence manifested by the deceased upon various occasions, and upon different subjects. They afford some ground for imputing to the deceased general insanity. But, as he was an habitual drinker, and was frequently intoxicated, it is impossible to say whether what is deposed to was the result of

temporary intoxication or of settled mania. I have, therefore, in coming to a conclusion, relied wholly upon the proof of delusion upon the two subjects intimately connected with the testamentary disposition of his property."

In Van Wyck v. Brasher, 81 N. Y. 260, Earl, J., at page 262, says as follows:

"A drunkard is not incompetent, like an idiot or one generally insane. He is simply incompetent upon proof that at the time of the act challenged his understanding was clouded, or his reason dethroned, by actual intoxication. Peck v. Cary, 27 N. Y. 9; Gardner v. Gardner, 22 Wend. 526. Here there was no proof of general unsoundness of mind, or of general insanity, and none whatever that the grantee used any artifice, undue influence, or fraud to procure the conveyance."

My attention has been called by one of the counsel for the proponents to the cases of In re Halbert's Will, 15 Misc. Rep. 308, 37 N. Y. Supp. 757, and In re Johnson's Will, 7 Misc. Rep. 220, 27 N. Y. Supp. 649; and I entirely agree with the conclusions reached in those cases. In the Halbert Case there is no suggestion of any condition of general insanity of the testatrix. The only issue was whether or not, at the time of the execution of the will, she was intoxicated. It was decided by the surrogate as a matter of fact that she was not intoxicated at that time. So, also, in the Johnson Case, the only issue was as to the drunkenness of the testator at the time of the execution of the will. He had suffered from delirium tremens, and some months after the execution of the will had been an inmate of an inebriates' home. Here again it was decided, as matter of fact, that he was not intoxicated on the occasion of his executing his will; and that, although "his mental powers were probably never robust, and had been weakened by his excesses," they had not become so far impaired as to deprive him of testamentary capacity. There was no contention that a generally insane condition of mind existed, caused by an excessive indulgence in drink. At page 223, 7 Misc. Rep., and page 649, 27 N. Y. Supp., Fitzgerald, S., says:

"Drunkenness may so becloud the mind as to make it incapable of doing an intelligent act. But the disability ends when the exciting cause is removed. In this it differs from insanity, which, once shown to exist, is presumed to continue until there is proof that intelligence and reason have asserted themselves."

The issue in the case under consideration is, not whether Mr. Ely's mind was so clouded from the immediate and temporary effects of alcoholic stimulants when he signed the will as to deprive him of that very small amount of intelligence necessary for a valid testamentary disposition, but whether or not he was at that time suffering from a condition of general insanity as a result of his excessive indulgence in drink over a period of many years. The preponderance of evidence, and that of the witnesses who knew the testator longest and best, and who are entirely disinterested, irresistibly leads me to the conclusion that the testator was generally unsound, and that he was generally insane, at the time of the execution of the will and codicils. Having reached the conclusion that he was insane as a matter of fact, the conclusion of law is inevitable that he was incompetent to make a will.

Probate denied.