In re JONES' WILL.

(Surrogate's Court, New York County. August 4, 1890.)

1. WILLS—VALUE OF ESTATE—EFFECT OF TESTATRIX'S EXAGGERATED NOTION.
    The fact that a testatrix, giving an annuity to a brother and the remainder of the income of the estate to the support of her minor child, had an exaggerated idea of the value of the estate, which would be insufficient to produce the annuity and also support the child, will not avoid the will.

2. SAME—UNDUE INFLUENCE—ILLICIT RELATION—PRESUMPTION.
    The fact that a testatrix has for years sustained an illicit relation with her uncle will not raise a presumption of undue influence invalidating a will advised by him, where he is not a beneficiary thereunder.

3. SAME—SUFFICIENCY OF EVIDENCE.
    Evidence on the probate of a will *held* not to show such undue influence as to invalidate it.

4. SAME—EXECUTION—CONTENTS—PRESUMPTION OF TESTATRIX'S KNOWLEDGE.
    Where a will is shown to have been in testatrix's possession several days before its execution, on which occasion it was produced by her, a presumption arises that she knew its contents.

**5. SAME—TESTIMONY OF SUBSCRIBING WITNESSES—CONFLICT.**

Where the testimony of subscribing witnesses to a will is in conflict, that which goes to sustain the instrument will be accepted, unless there is evidence to corroborate the opposite view.

**6. SAME—FORMALITIES OF EXECUTION—PUBLICATION.**

Where a testatrix afflicted with a malady known to her to be dangerous, but in full possession of her faculties, requests her physician to attest her signature to a document in her hand, saying that she wished to make some provision for her boy, that there were some things she wished him to have, it constitutes a sufficient publication of the document as a will, though its character is not further indicated.

**7. SAME—FOREIGN WILL—WHAT LAW GOVERNS.**

The attestation of a will by the subscribing witnesses in testatrix's presence, though required in New Jersey, is not necessary to be shown in order to admit a New Jersey will to probate in New York.

Proceedings for the probate of the will of Agnes Livingston Jones, deceased, in which Edward P. Jones appears as contestant. Will admitted to probate.

RANSOM, S. The paper propounded as the will was executed in October, 1888. By it the decedent gives her estate to her executors in trust, and from the income she directs the payment to her brother, Charles Welsh, the sum of $20 a month, the residue to be applied to the support, maintenance, and education of her infant son until he becomes of age, when the estate is to vest in him. Should he die before maturity, it goes to said Charles Welsh for life, with remainder over to Edward O'Neil, a cousin, and the son of an uncle, David O'Neil, if he reaches his majority, and, in default thereof the executors are to divide the estate either among the decedent's relatives or among charities, in their discretion. Said Charles Welsh and Addison O'Neil, a cousin, are named as executors, and are appointed the guardians of the child. Objections to probate, denying the validity of the execution, and alleging fraud, circumvention, and undue influence in its procurement, were filed by the husband, Edward P. Jones. The decedent had been twice married, first to one Livingston. Her father had died from suicide, in Brooklyn. According to her own statements, she had for several years been more or less provided for by her uncle, David O'Neil, and from means received from him she had taken care of her first husband as well. On the death of Livingston she had received the beneficial interest under a life policy taken out by him. She stated that the most of the sum was lost by an investment in stocks, but with the residue she purchased real estate in Brooklyn, to complete the payment of which her second husband, Jones, advanced the money. That the investment was the source of much income is doubtful, for before her last marriage she was for three years practically a charity patient, attended at periods 20 times a month by a physician from a dispensary in Brooklyn. It was not until she married her second husband, the contestant, that her pe-

cuniary condition was improved. The evidence shows that he furnished her an excellent home, and provided for the household with liberality. Her own declarations in this regard confirm the statements of others, for she often spoke of his kindness. He intrusted her with large sums of money, amounting to hundreds of dollars at a time, and purchased real and personal estate in her name. Her declarations at the time were that she regarded the transactions as in the nature of a trust for him, though, nearer to the day of her death, she announced her purpose to dispose of the property by will without regard to his interest. I have no doubt that the bulk of the estate came to her as gifts from her second husband. There is no proof of its value. To provide for the payment of $300 a year for the support of her brother would require, under favorable circumstances, the investment of at least $5,000. Whether the income of the residue will be sufficient for the support and education of her child, is a matter of conjecture. But the provision for her brother, who is presented uniformly in the evidence as a thriftless fellow, is in consonance with her course for many years, for he had relied more or less upon her for provision prior to her marriage with the contestant, and afterwards had been supported by him in their house. If she had an exaggerated idea of the value of her estate, and supposed that the income for the child would be greater than it may prove to be, the fact will not avoid the will. The general course of proof is that the decedent lived on terms of affection for her husband until about the period of her illness, and her change of feeling then seems to have been concealed from him. The change is only evidenced by her declarations to others that he had been unfaithful to her; that a young woman had confessed to her that she had had improper relations with him in her house, and she could no longer remain his wife, and she intended to procure a divorce. An alleged confession in writing, with the name of the young woman implicated signed to it, was produced on the hearing, though there was no positive proof that the paper was either written or signed by her, but it is a fair inference that such was the fact. It is dated August 24, 1888, a few weeks before the will was executed. The decedent also stated that her husband was a gambler, and a dealer in "green goods," and that he was the associate of low persons, men and women. The husband and young woman sought to be implicated with him by the declarations of decedent were competent witnesses to deny the truth of the statements affecting them, but neither took the stand in their own defense. The decedent stated to different persons that she had for years sustained a relation of sexual intimacy with her uncle, David O'Neil, the father of one of the executors, and that this extended over a period of more than 20 years prior to the time when she was taken with the malady which caused her death; that early in their intimacy the uncle was prosperous, and had liberally supplied her with means. Later, when he had met with reverses, she reciprocated his pecuniary favors by giving him money from the bounty of her husband, without the husband's knowledge. There seems to have been little attempt by her to conceal

the fact of her confessed criminal relations with him from those in whom she had confidence. O'Neil was a competent witness to have denied her statements, but he did not offer himself as a witness. He stands, therefore, guilty of the charge by every fair intendment.

The law is well settled in this state that, though the declarations of a testator are not admissible as evidence of the facts stated, they do reflect light on his personal feelings and mental condition. But there are cases when such declarations, uncontradicted, if in harmony with facts proven tending to the same end, carry conviction to the mind of an existing belief by the declarant in the truth of the facts stated, which of itself may sufficiently account for the testamentary disposition in the given case. In June, 1888, a tumor appeared in the decedent's breast, which later proved to be a cancer. During that month she arranged to visit a lawyer, with witnesses, to execute a will, and it is probable from her statements that she proposed making her husband and her son the principal beneficiaries, though there is no proof as to the arrangement of the benefactions. Doubtless it would have been executed that day but for the visit of her uncle, David O'Neil, for, after a protracted interview with him, in which she was deeply moved, she stated that she had changed her mind, because O'Neil was not satisfied with way she was going to make the will, and had said she should provide for her brother, and that for this O'Neil would not take the husband's word. It is to be noticed here that this man, David O'Neil, does not benefit in the least by this will. Two weeks before the execution of this will the decedent is shown to have had conversations in respect to the paper with Addison O'Neil, one of the executors, and subsequently Mr. Parmly, its draftsman, had an interview with her at her residence. When he had completed the paper, it was given to Charles Welsh, the other executor, to be taken to her. Parmly, being an attorney, under section 835 of the Code, was incompetent to testify to his conversations with his client. But I have no doubt that the instrument expresses her testamentary wishes, for in September, within a month of the date of its execution, she stated to others that she wished to provide for her brother and the O'Neils, but that her husband would object. In the same month she told her husband's sister that, if she provided for the O'Neils in writing, her husband would not submit to it, and if she talked to him about it he would say something against it. She expressed to his sister her distrust of her husband in carrying out her wishes, and asked her if she would witness her will provided she did not make her husband the executor. This the sister declined to do. In November she told Mrs. Hale that she had made her will, and had left everything to her people, and left her husband out. In December she stated to Miss Schell that she had fixed her property so that her child "should have the benefit principally," and in April or May following she told her that the child "was to have the benefit of most of her property." Three weeks before her death, in 1889, she stated to Mrs. Sarah Jones, her sister-in-law, that she had willed everything away from her husband, and about the same time she wrote a letter to Mrs. O'Neil, in which

she manifested a deep interest in her brother, Welsh, and stated her wish that her husband be not allowed to have the child. It is probable that David O'Neil had much influence upon her to induce her to contemplate a change of her scheme for the testamentary disposition of her property, and it is clear that it was the representations of her brother, Welsh, and the activity of Miss Schell in bringing about an interview between the decedent and the young woman inculpated, which resulted in the confession by the latter of her illicit relations with the husband, and that the jealousy aroused thereby finally determined the decedent to not make him either a legatee or guardian of their child. The proofs show that both David O'Neil and Welsh disliked the husband, though both had for years, through the decedent, been secretly receiving benefactions from his wife out of money that came from him. It is equally apparent that the husband entertained hostile feelings towards O'Neil. But, if her declarations in respect to the character, pursuits, and habits of her husband were true, the selection of others for the guardianship of her child was natural and proper. The fitness of the cousin, Addison O'Neil, and the brother, Charles Welsh, for the discharge of the trust, is a matter which can be inquired into in a proper proceeding begun for that purpose.

Contestant claims, in view of the relations shown to have existed between the decedent and her uncle, that a presumption arises of undue influence, and the case of Dean v. Negley, 41 Pa. 312, 80 Am. Dec. 620, is cited in support of his contention. Though the doctrine laid down in that case has been affirmed by the appellate courts in the West, it has never been accepted in this state. Where a testator makes a mistress the beneficiary of his bounty when he has a wife living, it only suggests the necessity of the closest scrutiny in reference to the facts attending the execution and preparation of the will, but it does not raise a presumption which shifts the burden of proof upon the proponent. In this case no such state of facts exists, for O'Neil, with whom it is said the decedent held the meretricious relation, is not a beneficiary under the will. Notwithstanding the will may have been executed as the result of persuasion exerted by her brother and O'Neil, I am convinced that it was her voluntary and well-considered act. The fact that, when within the sight of death she stated that she had done her husband a great wrong, cannot revoke the instrument. In Jackson v. Kniffen, 2 Johns. 31, 3 Am. Dec. 390, the court of errors held that the subsequent declarations of a testator, extending over several years, and to near the hour of his death, that his will had been procured by force, could not be admitted as evidence of the undue influence alleged in its procurement. The principle was reaffirmed in Waterman v. Whitney, 11 N. Y. 157, 62 Am. Dec. 71, and it has continued to be the law of this state until the present time.

The paper is also contested on the ground that there is not sufficient proof of a valid execution. It is shown to have been in the possession of the decedent several days, and was produced by her on the occasion of its execution. The presumption is that she knew

its contents; and the oral declaration of her wishes, which conform to its provisions, show that she did. When it was signed, Dr. Carpenter, one of the witnesses, testified that the decedent said it was a provision for her boy—something she wanted him to have. "I fear that I will not get through this sickness. There are some provisions that I wish to make for my boy—some things I want him to have," and the decedent asked him, "Would you object to witness my signature?" He said that he did not exactly understand what she meant by those words "to witness her signature to a paper or document which Mrs. O'Neil had in her hand or got at that time." Then, in answer to a question by proponent's counsel if the statement contained in the attestation clause which he signed, and which were shown him were correct, he replied, "I judge so." Yet when re-. called by the contestants at a subsequent hearing he stated that the decedent did not characterize the paper; that she said nothing about a will; that she did not read it, nor did he read it, or any part of it; and that he did not read the attestation clause, nor was it read in his presence. I am not favorably impressed by this witness. He does not appear honest and disinterested. But Mrs. O'Neil, the other subscribing witness, states that the decedent said to Carpenter, after he had dressed her breast, "Doctor, I am going to ask you to sign my will," or "I ask you," or something to that effect, and he said, "Certainly." She further states that she went to the desk, placed the writing material handy for the doctor, handed the paper to the decedent, who read the first clause aloud (the language of which is declaratory of the paper being a will), and the decedent then gave it to Mrs. O'Neil, who placed it on the desk, when Carpenter signed it, and the decedent then requested her to sign, and she did so. If Mrs. O'Neil's testimony is to be credited— and I see no reason to doubt it—the requirements of the statute were complied with. Though she is the wife of David O'Neil, and is probably in sympathy with her husband's feelings of dislike of the decedent's husband, the circumstances are such as to satisfy me that her memory is trustworthy in respect to the facts attending the execution, while the statements of Carpenter are halting and uncertain, equivocal, and apparently prejudiced. He testified that the decedent did state that the purpose of the instrument was to make a provision for her son, and that the reading of the declaratory clause at the beginning, showing that it was a will, was forgotten by him. But when the statement of two subscribing witnesses are at variance in respect to some of the essential facts, admitting that each intends to be truthful, courts will not presume that the testimony which would go to avoid the instrument shall be accepted against that of the other, which proves it, unless there is sustaining evidence showing that the instrument itself was the result of fraud or imposition upon the testator. I am convinced that Mrs. O'Neil's recollection of the facts is to be trusted on the points in which she and Carpenter disagree. With a full attestation clause, if any presumption arises, it is in favor of due execution, even though the event was of recent occurrence. But only a substantial compliance

with the requirements of the statute is essential. Leaving out of consideration the testimony of Mrs. O'Neil in respect to the reading of the declaratory clause, and of decedent's statement in words what the paper was, the language she did use, as testified to by Carpenter, is equivalent to a declaration that it was her will, when considered in connection with all the facts and circumstances, and especially her physical condition, which made a testamentary disposition of her property natural. And it is almost incredible that Carpenter could have been unaware of the nature of the instrument he signed. If, with the other statutory requirements proven, a statement in the presence of a testator who is almost in extremis, but is of sound mind, that a paper presented is a will, involves an implied declaration by him of the fact sufficient to admit it to probate, how much more should a paper be held valid when a testatrix, in the full possession of her faculties but conscious of a dangerous malady, states that the purpose of the paper is to provide for her child, and then signs it in the presence of the witnesses; and requests them in terms to attest her signature?

A question arose on the trial in respect to the location of the desk at which the subscribing witnesses attested the execution of the will, and a large amount of testimony was given, the purpose of which was to show that it was in the front room, and that the witnesses could not have signed in the presence of the decedent, as stated in the attestation clause, she being in the rear room, confined to her bed. This testimony was evidently given under the theory that, as the will was executed in New Jersey, the law of that state, which requires the attestation in the presence of a testator, must control in a proceeding to probate as an instrument in this jurisdiction. Such mode of attestation was required in this state until the Revised Statutes, but since the decision in Lyon v. Smith, 11 Barb. 124, the attestation by the subscribing witnesses in the presence of the testator is not essential, and under the present provisions of the Code there is nothing that requires a different rule to apply to a will executed in a foreign state and presented for probate here. But the testimony in reference to the location of the desk has value as reflecting upon the trustworthiness of the memories of the two subscribing witnesses. As Carpenter, when first called, did not assume that he did not sign the will in the decedent's presence, and only came to the conclusion that the desk was in the front room after visiting the premises at the instance of the contestant's counsel, it reflects seriously upon the value of his statements, not only in that regard, but in respect to other facts connected with the factum of the will when they differ with those of the other subscribing witnesses. The desk had occupied two different positions during the illness of the decedent. It was for a long period in the front room, but near the time of the execution it was removed to the back room, where the decedent was lying ill. Except the testimony of Carpenter, there is nothing to show that it was not near her bedside when the will was signed, as testified to by Mrs. O'Neil; and her statement is rendered probable by the testimony of Lizzie O'Byrne,

who states that the removal to the back room was in October, where it remained for some time. The testimony of contestant's witnesses as to the location in the front room does not refer to the period of the execution of the paper. They trace its presence there in September, and as late as the first week in October. Mr. Parmly, the attorney who drew the paper, states that it was in the back room when he made his first call upon the decedent in October, and Mrs. O'Neil testifies that it was placed there the first week in the month. Mrs. Hale saw it again in the front room the first week in November. Assuming that Carpenter desired to testify truthfully, I am satisfied that his statement is to be attributed to a recollection of having generally seen it in the front room. The blank left for the date of the will is not filled in, but the proof in respect to other events in connection with the matter fixes it as having been executed somewhere about the middle of the month, at which time no witness except Carpenter testifies to its being in the front room.

The paper propounded is admitted.