"That where domestic creditors have in their hands the legal title and the right to resort for the payment of their debts to securities belonging to a nonresident decedent, which are not taxable under the laws of this state, indebtedness due such creditors is not to be offset against the value of property of such decedent otherwise taxable under the Transfer Tax Law of this state."

This decision would seem to govern the case under consideration, except that it appears in the Pullman Case that at the time of the appraisal the account had not been closed out, while in this case it is expressly stipulated that the account was closed out on the day after the death of Mr. Burden. But the executrix in this case has done just what the court in the Pullman Case reasoned that the parties would have done in that case had the account been closed out before the appraisal, viz., paid the debt with the pledged property, leaving unpledged property liable to taxation. It would therefore seem that the decision here must be governed by the decision in the Pullman Case.

Let this matter go back to the appraiser, to appraise and assess the taxable property in accordance with the stipulation of the parties and the views herein expressed.

---

(47 Misc. Rep. 535.)

### In re SARASOHN'S WILL.

(Surrogate's Court, New York County. June, 1905.)

WILLS—EXECUTION—EVIDENCE.
> Evidence in an application for probate of a will *held* insufficient to show that decedent declared in the presence of a witness thereto that the paper propounded was his will, requiring refusal of probate.

In the matter of the will of Kasryel H. Sarasohn. On application for probate. Denied.

Rastus S. Ransom, for proponent.
Nathan Byier, for contestant.

THOMAS, S. There are some statements in the testimony of the draftsman of the propounded paper, who is also one of the witnesses to its execution, which, if taken by themselves and accepted as true, would justify a finding that the decedent declared to the witness Wolberg that the paper was his will. Other statements made by him would seem to lead to a different result. Thus, when asked by counsel for the proponent as to whether anything was said by the decedent to Wolberg about the paper, he said:

"I cannot remember that he told him what it was. I merely heard him say that he requested him to sign."

This witness was examined through an interpreter. Mr. Wolberg denied having heard any declaration to the effect that the paper he was called upon to witness was a will, and he asserted that he signed the paper as a witness, at the request of the decedent and without knowledge of its character, other than what could be gained from a description of it as a note or memorandum. He testified in English, and appeared to me to be an educated man of unusual intelligence, who

was trying to tell the truth. If the apparently inconsistent statements of the draftsman can be reconciled in favor of the proponent's theory, there is a clear conflict between the two subscribing witnesses. The nurse, called by the proponent, who was present during all of the brief period while Wolberg was in the sick room of the decedent for the purposes of the execution of the paper, testified that the decedent told Wolberg "to sign this paper." And again, "He said to Enoch he should sign his name." According to this witness the character of the paper as a will was not spoken of by the decedent to Wolberg, or by the draftsman in the presence of the decedent and Mr. Wolberg, at any time prior to its complete execution, thus corroborating the story of Mr. Wolberg and contradicting the portions of the testimony of the draftsman relied upon by the proponent. He also testified that, after Wolberg had signed, and while the parties were still together, the draftsman said to Wolberg: "That is a will." It is not claimed that the decedent, either by word or gesture, manifested any concurrence in this declaration, or gave any sign that he had heard it. That any such declaration was made is in contradiction to both of the subscribing witnesses, who agree that nothing was said or done after the paper had been signed by Wolberg, when he immediately left the room. It is hard to believe the testimony of the draftsman that he made the declarations to Wolberg which he says he did, at times prior to the execution of the paper, and also to believe that it occurred to him to explain to Wolberg that the paper was a will, after it had been signed by Wolberg, and when such explanation would seem to have been unnecessary.

It is not an unusual thing for one or more of the subscribing witnesses to a will to deny the observance of some of the prescribed formalities of execution, and I am referred to the numerous cases where wills have been admitted to probate, notwithstanding such denials. In each case the question is one of fact. In many of them the proponent was aided by circumstances not present here, such as the fact that the witnesses had signed an attestation clause reciting the details of due execution, or the execution of the paper had been superintended by a competent lawyer, or by some person shown to be familiar with the requirements of the law. In this case there was no attestation clause, no lawyer was present or had anything to do with the matter, and none of the persons present are shown to have had any knowledge of the law governing the execution of a will, further than to understand that two witnesses were necessary. The paper was prepared by a person unable to speak our language and without any special knowledge of the law of this state. It was not written in the English language, but in Hebrew characters and in classical Hebrew. It was written upon two sheets of paper, which were not in any way attached or fastened to each other. Mr. Wolberg says that he only saw the sheet which bears his signature, that he was unable to read it, and that he did not read it. He was an employé of the decedent, accustomed to obey his instructions, and it is not remarkable that he should certify as a witness to the execution of a paper duly signed by his employer without inquiry as to its character. It is quite clear that it was desired to keep it secret that a will was being executed, and it would seem that the draftsman and the decedent did

not know how important it was that the subscribing witnesses should both know just what they were doing.

The general legal principle, that the burden of proving every necessary fact rests upon the party alleging it, is fortified as to proceedings to prove wills by the statute requiring that the surrogate must be satisfied as to due execution. Code Civ. Proc. § 2622. In this case I am not so satisfied, and, on the contrary, I am of opinion that the weight of evidence requires me to find as a fact that the decedent did not, at any time, declare to or in the presence of the witness Wolberg that the propounded paper was his will. Probate will therefore be refused. Costs will be awarded to both parties, payable out of the estate. Tax costs and settle findings and decree on notice.

Probate denied. Costs to both parties, payable out of estate.

---

(47 Misc. Rep. 538.)

### In re BLACKSTONE'S ESTATE.

#### (Surrogate's Court, Oneida County. June, 1905.)

WILLS—CONSTRUCTION—BEQUESTS.

> Testatrix, after making certain bequests, gave certain personal property to one H. and "all money that remains after all debts are paid." Testatrix left personal property amounting to about $5,000 and real estate worth $1,500. At the time of the making of the will she had $400 in money, and $327 at the time of her death. After the payment of expenses, debts, and legacies, the personal estate, consisting of furniture, mortgages, and railroad stocks, amounted to $3,839, and the real estate which was not devised was inherited by her brother. Held, that what remained of her personal estate passed by the will to H.

In the matter of the estate of Martha A. Blackstone. Proceeding for judicial settlement. Decree rendered.

L. M. Martin, for executors.
C. Lansing Jones, for Harriet E. Blackstone.
William Townsend, for James L. Blackstone.

CALDER, S. Martha A. Blackstone died in the town of Kirkland, Oneida county, N. Y., on the 22d day of October, 1903, leaving a will dated November 3, 1900, and a codicil December 9, 1902, by which she bequeathed certain specific articles to friends and relatives, $400 to Clinton Cemetery Association, $50 to Edward J. Blackstone, and the family pictures and $100 to her brother James L. Blackstone. The fourth clause of said will, and the important one to be considered here, reads as follows:

> "I give and bequeath, after all debts are paid, to Harriet E. Blackstone, of Galesburg, my watch, silver spoons, forks, tea set, ice pitcher, china tea set, clothing, all fancy baskets and all they contain, all money that remains after all debts are paid, to her."

Her will and codicil were holographic. Her estate consisted of a house and lot in Clinton, N. Y., of the value of $1,500, and personal property $4,836. Upon the date of the execution of her will she possessed $400 in money, at the date of her codicil $588, and at the time of her death $327. After payment of debts, legacies, and expenses, the