Where a will is not signed by testator in the presence of witnesses, it is necessary that there be a declaration that the instrument is his last will, and that he signed it, and that the mark thereto is his signature, and a failure to comply with any of these provisions renders the will ineffective.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 302–304.]

**2. SAME—INCAPACITY OF TESTATOR.**

Probate of last will of an aged and childless man denied on evidence showing that the alleged testator was actually incompetent at the time of the pretended execution of the will, and that it was not executed in compliance with the statute.

In the matter of the last will of Henry A. Rogers, deceased. Probate denied.

Joseph H. Breaznell (Jacob Brenner, of counsel), for proponent.
Foley & Powell, for contestant.
Harris G. Eames, special guardian.

CHURCH, S. The probate of the instrument offered is resisted on the ground that the deceased, at the time of its execution, did not possess sufficient competency to execute a will, and also that the alleged will was not executed in conformity with the provisions of the statute.

The will in question is the work of one Latto, who is not an attorney, but who evidently assumes to possess some legal knowledge. On the 25th of July, 1906, he claims to have received instructions from the deceased to prepare the will, which by its terms gave everything to his wife. It is in Latto's handwriting and was prepared by him on the 26th of July, the day after he says he received the instructions. He brought the will from his place of business in New York over to Brooklyn, intending to have it executed on that day; but, for some reason which is not explained, he failed to do so, and took it back with him to New York on the following day, the 27th. On the afternoon of the 27th he visited the residence of the deceased with one Kerr, who was a notary public. Kerr and Latto went into the presence of the deceased, who was at this time unable to write, and Latto wrote the name of deceased at the foot of the will. The notary public, Kerr, thereupon took the acknowledgment of the deceased to the will, the same as if it had been a deed, and, signing the acknowledgment, which is a part of the document offered for probate, left the house. Subsequently the subscribing witnesses to the will—Iverson, Drum, and Boehrer—came in, and the execution of the will was then completed. While this is the general course of events attending the drafting and pretended execution of the will under consideration, there are a number of facts in dispute. Indeed, it can be safely said that there is hardly a single important fact in connection with the whole occur-

rence which is not the subject of a sharp controversy in the testimony between some of the witnesses. At the time of the execution of this will the deceased was a very old man. He had no children, and, while the provision in favor of his wife would under ordinary circumstances be regarded as a perfectly natural one, yet it appears that he had a brother, who is a very old and somewhat helpless, and several sisters, whom he had for several years supported. His widow, on the other hand, was in good health, had property of her own, and a grown-up son who was apparently a prosperous business man. The deceased had married this woman in the latter years of his life; and there was no evident reason why he should make a special provision for her and sacrifice his brothers and sisters, to whose wants he had so carefully attended for many years.

In considering the circumstances surrounding the making of this will, therefore, we cannot escape the conclusion that it is a somewhat unusual and unnatural document. While, of course, a testator who possesses testamentary capacity may dispose of his property in accordance with any whim or caprice, still the question of the reasonableness of a will is always a subject of much importance in considering the subject of doubtful competency. Latto, who was not a subscribing witness, but who supervised what was done at the time of the execution of the will, testifies that, as the deceased was too weak to write, he requested Latto to write his name on the document, and then made his mark thereafter, and that he declared the document to be his last will and testament, and asked the subscribing witnesses to sign it as such.

The testimony of the subscribing witnesses, however, is not in harmony. Iverson, the first witness (who procured the attendance of the other subscribing witnesses), states that deceased admitted this was his last will, and also asked them to sign it as witnesses. But he declares definitely that he did not see the deceased make his mark to the will; and at no place does he state that the deceased distinctly acknowledged that he executed the will. It is apparent he was attending to what Latto was saying and doing; and from his evidence it appears that all that the deceased did was to give an affirmative answer to the question of Latto as to whether it was his will or not.

The testimony of Drum, the next subscribing witness, is even more unsatisfactory. He has no recollection of seeing deceased sign the paper or place his mark thereon; nor has he any recollection of the deceased specifically acknowledging the signature at the foot of the will to be his own. It is evident in this case that all that the deceased did, so far as he was able to observe, was to acquiesce in some suggestion made by Latto.

The testimony of the third witness, Boehrer, is very significant. In the first part of his evidence he states that deceased was asked if this was his will, and that he made some slight acquiescence. The witness thereupon had asked if the deceased had signed the will. To this the deceased made no answer; but Latto stated that the deceased had made his mark on the paper, and then Latto requested the witness-

es to sign their names. Upon being asked the usual question whether the deceased was of sound mind,· witness asserts that he was in a condition that a man of his age would be expected to be in. A somewhat extended examination was insufficient to get him to explain definitely the condition of the deceased, or what he meant by the statement that he was in a "normal condition for a man of that age." His final evidence was as follows:

"Q. Do you mean to say that an old man does not have as much to say about how he wants his property to go as a young man would have to say? A. That is what I would say in this case. Q. It is not what you would say in this case. You say this man was about the same as any old man of his age. Do you mean in this particular case, and in no other case, that is what he would do? A. I say that he was in a very weak and feeble condition, and did not show any very active signs. Q. Any active signs of what? A. Signs of life. Q. Did he show any signs of life? A. I believe he knew what was going on. Q. Did he show any signs of it? A. He didn't show anything."

It is impossible for a person to have heard this man's evidence, and to have observed his demeanor on the stand, without reaching the conclusion that the witness was embarrassed by the fact that the attempted execution of the will in question was being forced upon a man possessing but very slight understanding of his surroundings; and that the witness regretted having been drawn into the controversy, and was endeavoring, in so far as possible, to escape any odium from what he had done. He admits that deceased did not say anything to anybody, that he saw him attempt to speak, but that his voice was so low that he could not hear what he said, and, but for the nodding of his head, he would not have known what he desired.

As has been noted, none of the subscribing witnesses saw the deceased make his mark on the paper or heard him declare in any way that the signature placed thereon was his signature. Latto's statement is that, while he wrote the name "Henry A. Rogers" on the will when the notary, Kerr, was present, and before the arrival of the witnesses, the actual cross on the paper was made by the deceased in the presence of the three witnesses and that they saw him make it. This contradiction between Latto and the subscribing witnesses is corroborated by the testimony of Kerr, who declares that he saw the deceased make the cross in question, and that thereafter Latto signed the name "Henry A. Rogers" thereto, and put his own name opposite such signature, with the word "Witness," and that thereupon he (Kerr) took the acknowledgment of the deceased. Kerr is very emphatic upon this point, stating that he would not have taken the acknowledgment of the paper but for the fact that he saw the deceased make his mark, and that Latto affixed his name as a witness thereto.

This testimony is reasonable and appeals to the natural sense. On the other hand, Latto's testimony that the notary public took the acknowledgment of the deceased when no mark was made, and that the deceased subsequently made his mark in the presence of the other witnesses, is unnatural; and I prefer to believe the story of the four witnesses to that of Latto. In addition, it is to be noted that section 41 of the statute of wills requires that "every person who shall sign the

testator's name to any will by his direction, shall write his own name as a witness to the will," under penalty of forfeiting $50 for neglecting so to do. If Latto did as he says he did, he violated the above provision and is liable thereunder; and it is also made apparent that he is totally ignorant of the statute of wills.

The contradiction between Latto and Kerr in relation to the making of the mark or the writing of the signature of the deceased on the paper is important, but these two witnesses differ even more widely as to the circumstances attending the taking of the acknowledgment to the will by Kerr. Latto's version is that, after reaching the house, Kerr stated that he did not want to act as a witness to the will because of the possible annoyance he might suffer by being brought to court in regard to the same; that thereupon Latto wrote out the acknowledgment on the paper, which Kerr took as if it had been a deed; and that then Kerr left, not, however, until he had affixed his seal thereto, which he was enabled to do by reason of having a small pocket seal with him. Latto does not attempt to explain how Kerr avoided any of the annoyance which he thought would attend his acting as a witness to the will by simply acting as a notary; and, of course, it is manifest that no such distinction exists. Kerr himself does not give a word of evidence on this subject confirmatory of Latto. On the contrary, he explicitly denies Latto's statement that he had a pocket seal with him, and declares that he had a ponderous seal at his office which he could not bring over, and that his seal was affixed to the document in question the next day, at his office in New York, where the will was brought by Latto. In addition, an inspection of the paper indicates that the acknowledgment was written at the same time that the will and attestation clause was written, as the handwriting, pen, and ink are uniform. The acknowledging of a will before a notary public in this manner is, of course, an absurd proceeding, and in no way forms an element in its proper execution. But the importance of the dispute on the subject between Latto and Kerr lies in the fact that it establishes either the frailty of Latto's recollection or his willingness to tell an untruth, and, in either event, demonstrates that his evidence is worthless, and that, therefore, his testimony as to the instructions received from the deceased, the testamentary capacity of the deceased, and the occurrences in the presence of the subscribing witnesses should be utterly disregarded. This shows, therefore, that there was no act performed or signature of any kind made by the deceased in the presence of the three subscribing witnesses. The decisions are explicit to the effect that, where the testator does not sign the will in the presence of the witnesses, it is necessary, in addition to the declaration that the document is his last will, that there be a further declaration that he has signed it and that the mark appearing thereon is his signature.

While the courts construe the statutes liberally so that their objects shall not be defeated, and consequently hold that any act substantially complying with the statutes is sufficient, yet they have never held that an absolute noncompliance with any essential provision of the law,

can be overlooked. This strictness of the decisions is evidenced in the Matter of Whitney, 153 N. Y. 259, 47 N. E. 272, 60 Am. St. Rep. 616, and Matter of Andrews, 162 N. Y. 1, 56 N. E. 529, 48 L. R. A. 662, 76 Am. St. Rep. 294, in each of which the Court of Appeals held that the wills offered for probate were invalid because they had not been signed at the end. In Matter of Mitchell, 16 Hun, 97, in which the drafter of a holographic will did not specifically declare that he had made the subscription at the end of the will, probate was denied. The court said in that case:

"Acknowledgment of the signature must include the same identification of the written words as necessarily exists when the witnesses see the testator write."

And, on the proposition as to the acknowledgment of the signature, the court declares:

"He never acknowledged or stated to either of them that the subscription which appears at the end of the paper was made by him. He did, it is true, declare that the whole instrument was his will. But that is not enough."

If the foregoing doctrine is to be applied to the case of a person of undoubted competency who had drafted a holographic will, how much more necessity exists for applying it strictly in the case of a helpless, feeble, dying old man. A holographic will was rejected in Matter of Turell, 166 N. Y. 330, 59 N. E. 910, because the deceased did not declare it to be his last will.

The various decisions quoted by counsel for the proponent, in which the documents considered were admitted to probate, are all based on the fact that the testator in each case had mental competency and testamentary capacity, and, in addition, an intelligent appreciation of what was being done and of its legal effect. Where such requisites exist, the decisions hold no technical requirement as to a detail of execution would warrant the court in rejecting the will of an otherwise competent person. Hence, if the many acts involved in the execution were performed in the presence of a competent and intelligent testator, with his acquiescence, a general authority on his part given to execute the same is sufficient. The leading cases sustaining this proposition of proponent are Hoysradt v. Kingman, 22 N. Y. 373; Gilbert v. Knox, 52 N. Y. 125; Matter of Phillips, 98 N. Y. 267; Matter of Beckett, 103 N. Y. 167, 8 N. E. 506; Matter of Hunt, 110 N. Y. 278, 18 N. E. 106; Matter of Cottrell, 95 N. Y. 329; Matter of Turell, 166 N. Y. 330, 59 N. E. 910. In Matter of Turell, last cited, the principle is well stated in these words, at page 337 of 166 N. Y., at page 911 of 59 N. E.:

"It must appear that, as between the testator and the witnesses, there was some meeting of the minds upon the understanding that the instrument was the testator's will, that it had been subscribed by him, and that the attestation of the latter was desired to the will as subscribed."

But all of these cases fall far short of holding that where the deceased, by old age and disease, is on the verge of the grave, incapable of raising his voice sufficiently to be heard either in affirmation or protest concerning what is being done, then the mere fact that the will is

signed in his presence, without his active dissent, is to be regarded as all that is necessary to establish its proper execution. The deceased was in the condition mentioned, as is amply shown by his niece, Mrs. Sammis, and by the physician. With the testimony of Latto rejected, the testimony of the three subscribing witnesses is insufficient to establish proper execution, irrespective of whether or not the signature of the deceased was properly acknowledged, for they all testify to his extreme weakness; Boehrer saying, "He was in a very weak and feeble condition, and did not show any very active signs of life," and, further on, that "he didn't show anything." It is plainly apparent that all he did was to give a feeble nod of acquiescence when spoken to by Latto.

A decision bearing very strongly on circumstances of this nature is that of Heath v. Cole, 15 Hun, 100, in which the court say, at page 103:

"The knowledge that the instrument which the witnesses are called upon to attest is a will must be communicated to them by the testator at the time of his subscription. It is apparent that in considering the question whether that was done in the present case we must bear in mind the testator's condition. When a man is in full health and strength, with all his senses in vigor, whatever is said for him and in his presence may, properly and without danger, be taken to be his act. The declaration that the instrument is the testator's will, and the request to the witnesses to sign may be made by another under such circumstances that they are plainly adopted by the testator and become his acts. But, when a man is feeble, and able to speak but faintly, at the very last of a sickness which has lasted for 11 years, and within a few hours of his death, then it is necessary to examine more carefully what takes place before him. It will not answer then to assume, without some clear proof, that he adopts the acts of those about him, who pretend to speak for him. In his feeble condition he may be unable to express his dissent, and it is unsafe to take his silence as acquiescence."

To the same effect is Matter of Lyman, 14 Misc. Rep. 352, 36 N. Y. Supp. 117.

Neither can the claim be advanced that the taking of the acknowledgment by the notary public and the witnessing of the signature of the deceased by Latto was a publication of the will, as it will be observed that neither Latto nor the notary pretends that at the time the deceased was asked if the paper was his last will and testament did he request Kerr and Latto to sign as witnesses. The principle that, where a will is executed under the supervision of an experienced attorney, there arises a strong presumption of compliance with the statutory requirements (Matter of Cottrell, 95 N. Y. 329), cannot be applied here, as it is evident that Latto had only a confused and muddled idea of what was necessary, and it would be strange if a will executed under such supervision complied with the requirements of statute. Matter of Sarasohn, 47 Misc. Rep. 535, 95 N. Y. Supp. 975.

Apart from the testimony as to the method of execution, the evidence not only fails to establish testamentary capacity but, on the other hand, expressly shows incompetency. From what is said by the niece of the deceased and by the family physician it appears that on the 24th and 25th of July the deceased was extremely weak. The physician declares that some other trouble was apparent which he was unable, at the time, to diagnose correctly. Mrs. Sammis, the

niece, states that on the days mentioned the deceased was very feeble and that he complained to her of his extreme weakness. His complexion was very pale and he seemed unable to make any movement whatever. The physician did not see him on the 27th, the day of the alleged execution of the will; but, upon calling to attend him on the following day, found that he was in a comatose condition, suffering from a cerebral hemorrhage. He explains that, where the aperture in the artery causing the cerebral hemorrhage is small, it takes some time for the hemorrhage to overcome the patient thoroughly or to put him in a comatose condition, and that, while this suffusion is taking place, the victim may be temporarily aroused and make perfunctory answers to those arousing him, but that these answers are made without intelligence. It is impossible for a physician, simply observing a person in a comatose condition from cerebral hemorrhage, to fix definitely the period at which the suffusion had its inception; but, from the various circumstances, as narrated by the witness, it was the impression of the physician that, on the day of the attempted execution of the will, the deceased was only capable of doing perfunctory acts, and could not bring to the execution of this will the intelligence which should be required.

In this connection, it should be noted that the niece of the deceased had suggested to the widow, the sole beneficiary under this will, that it was not only desirable, but necessary, that somebody should be retained to assist in caring for the deceased; there being no person present to minister to his wants. The widow refused to bring some one in for this purpose; and she was the only person with the deceased, therefore, who could tell when it became evident that the hemorrhage was getting the upper hand of his intellect. If the comatose condition observed by the physician had been the result of a hemorrhage occurring after the execution of the will, can there be any question but that she would have been promptly placed upon the witness stand to prove the fact? The failure to call this woman to the stand to explain the progress of the ailment of the deceased and of his condition on the 24th and 25th of July is therefore very significant. Latto endeavors to convey the impression that there was not the slightest trace of sickness observable about the deceased at all. The worthlessness of his evidence has already been shown; and, in view of the testimony of the physician that this man died the day after the execution of the will and that he saw marked evidences of senility two days before, and in view of the testimony of all of the subscribing witnesses as to his condition, and in view of the testimony of Mrs. Sammis, we can very safely assume that this evidence of Latto is also incorrect.

The proponent contends in his brief that there should be in the mind of the court a tender regard for the wills of aged persons. The aged are, of course, always entitled to the utmost consideration; but I have looked in vain through the various citations made by counsel to find anything which at all conflicts with or modifies the principles to which I have alluded. And assuredly there is no way in which the rights of the old can be more carefully conserved than by a careful scrutiny of all the circumstances attending their transaction of a

testamentary nature, to the end that advantage is not taken of their age and feebleness. The cases and remarks referred to in the brief of counsel seem to be directed, almost exclusively, to instances where the will under consideration is the expression of the natural feelings of the deceased. Indeed, even the quotation which he makes from Schouler speaks of the will "which appears not to have been procured by fraudulent acts, but contains those very dispositions which the circumstances of his situation and the course of his natural affections dictated." As we have seen, the will under review would leave the next of kin of the deceased to the mercies and the bounty of strangers, and is consequently unnatural and unusual; as it is assuredly much more natural to assume that it was the intention of the deceased to let his wife receive the portion of his estate to which she would be entitled under the statutes in the event of intestacy, and to permit the balance of his property to go to his brothers and sisters, than to believe that, after having for many years so carefully ministered to their needs, he would willingly see them spend their declining years in the poorhouse or dependent upon the charity of strangers. In such a situation there seems to me to be no occasion to strain at an effort to admit this will to probate from any pretended deference or general tenderness of the law to the wills of the aged.

As the evidence, therefore, not only fails to show testamentary capacity in the deceased at the time of the pretended execution of this will, but, on the contrary, establishes actual incompetency, and, as it also appears that the will was not executed in substantial compliance with the requirements of the statute, it must be refused probate.

There only remains to be said that this case is but another instance of the folly of not having important transactions of this character attended to by skilled and honorable attorneys.

Let findings and decree be drawn in accordance with this opinion. Probate denied.